UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BORIS O. BERGUS,           )
                          )    CIVIL ACTION NO.
          Plaintiff,      )    18-10323-DPW
                          )
v.                        )
                          )
AGUSTIN M. FLORIAN        )
                          )
          Defendant.      )


MEMORANDUM
REGARDING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
October 13, 2022

     Some 20 months after Dr. Agustin M. Florian, the defendant in this action, brought a state court employment compensation action against Dr. Boris O. Bergus, his former colleague in medical practice, Dr. Bergus in turn brought this action against Dr. Florian, alleging violation of Massachusetts securities law and breach of fiduciary duty.  The case before me arises from Dr. Bergus's investments in a Peruvian company controlled by Dr. Florian's brother-in-law, Señor Castro Baca.  Dr. Florian is also a shareholder in that company.  Dr. Florian has moved for summary judgment.  For the reasons that follow, I will deny Dr. Florian's motion for summary judgment as to Dr. Bergus's Massachusetts securities law claims but grant the motion as to Dr. Bergus's claims of a breach of fiduciary duty.

## I. BACKGROUND

### A. *Factual Background*[1]

#### 1.   The Parties

The plaintiff Dr. **Boris Bergus**, a Florida resident, is a physician who maintains a medical practice through his principal office in Norwood, Massachusetts.  The defendant Dr. **Agustin**

---

[1] The basic factual background set forth in this section is essentially undisputed unless otherwise noted, and all inferences are drawn in the light most favorable to Dr. Bergus, the non-moving party with respect to Dr. Florian's summary judgment motion.  *Vineberg* v. *Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008).  In this Memorandum, in considering the facts based on the summary judgment record submitted in 2020, I additionally will refer to Dr. Florian's supplemental summary judgment filing [Dkt. No. 97] and Dr. Bergus's response [Dkt. No. 99], and affidavits of record in the case, even if not submitted specifically for the summary judgment matter now before me. *Carmona* v. *Toledo*, 215 F.3d 124, 132 n.7 (1st Cir. 2000) ("An affidavit of a party that is on file in the case will be considered by the court regardless of the purpose for which it was prepared and filed." (internal quotations and citation omitted)).  Dr. Bergus opposed [Dkt. No. 99] Dr. Florian's motion for leave to supplement the summary judgment record [Dkt. No. 97] and moved to strike his second affidavit and the accompanying exhibits filed in support of his sur-reply to Dr. Bergus's second motion for attachment [Dkt. No. 89].  I will deny Dr. Bergus's efforts to strike, and overrule his objection to the supplemental summary judgment evidence [Dkt. Nos. 89, 99].  *See Suzuki* v. *Abiomed, Inc.*, No. 16-12214-DJC, 2019 WL 109340, at *7 (D. Mass. Jan. 4, 2019) (citing *OFI Int'l, Inc.* v. *Port Newark Refrigerated Warehouse*, No. 2:11-cv-06376 (WJM), 2015 WL 140134, at *1 (D.N.J. Jan. 12, 2015) (explaining that "[f]ollowing the 2010 amendments to Rule 56, a motion to strike is no longer a proper means of attacking the admissibility of summary judgment evidence" and construing a motion to strike certain summary judgment evidence as a Rule 56(c) objection). While the supplemental filings are marbled with overwrought argument and conclusory assertions, I have considered only the underlying factual dimensions to those filings.  *See infra* note 8.

**Florian** was born in Peru, where he once ran for president and
has many connections.  Dr. Florian later moved to the United
States and has been a practicing surgeon in this country since
1966.  He started to work on a contract basis as a physician at
Dr. Bergus's Norwood office in 2011.  He quit in October 2015
and filed a lawsuit on April 21, 2016 in Massachusetts Superior
Court against Dr. Bergus and his practice, Encompass Care
Company, Inc., for employment-related claims.  *Florian* v. *Bergus
et al.*, Norfolk Super. Ct. No. 1682CV00516 (filed Apr. 21,
2016).[2]

---

[2] Following the filing of a motion for summary judgment by Dr.
Bergus in the parties' state case, the case was continued
repeatedly at the request of the parties and with the agreement
of the state court.  On their face, the principal claims in the
state court matter and in this case do not overlap.  Dr.
Florian's complaint in the state case asserts that he was not
paid sufficiently for his services while employed at Dr.
Bergus's medical practice.  The state matter is, in essence, a
contractual dispute over the payment due to Dr. Florian under
the parties' "Independent Contractor Agreement."  It appears,
however, the parties' state employment contract dispute, in
which Dr. Florian made claims against Dr Bergus, led to Dr.
Bergus's instant action before me, where Dr Bergus in turn sued
Dr. Florian relating to Dr. Bergus's investments in a company
run by a member of Dr. Florian's family.  This connection
between the initially filed state case and this later filed case
was made explicit by an abuse of process counterclaim filed by
Dr. Florian in response to the Complaint in this case.  The case
before me, Dr. Florian contends, has been filed in retaliation
for the state action.  I denied Dr. Bergus's motion to dismiss
this counterclaim in May 2018, and then upon reconsideration in
June 2018, observing at the hearing on the motion that the
question of ulterior or improper purpose in the case before me
would be best addressed following the outcome of the state case.

In September 2012 and in May 2014 when Dr. Florian was still working with Dr. Bergus, Dr. Bergus signed two contracts to invest $125,000 and $250,000, respectively, in a Peruvian company named Esperapal Juliaca Caracoto, S.A. ("Company") that operates a water and sewer project in Peru.  The Company's President, Señor **Castro Baca**, is Dr. Florian's brother-in-law. Señor Baca acts alone in the management role at the Company. Dr. Florian is the only other shareholder of the Company apart from Dr. Bergus and Señor Baca.  Because Dr. Bergus does not speak Spanish and Señor Baca does not speak English, the only way for Dr. Bergus to communicate in person with Señor Baca has been through translation by Dr. Florian.

### 2.   First Investment in September 2012

In the late summer of 2012, Dr. Florian approached Dr. Bergus about an investment opportunity in the Company.[3]  This was the first time the two discussed any investment in Peru. Dr. Florian told Dr. Bergus over the telephone that he had a great opportunity for Dr. Bergus to invest in a water project that Señor Baca's company was pursuing.  Dr. Florian sought to have Dr. Bergus invest $125,000.  Dr. Bergus learned that Dr. Florian himself had invested $1 million in the Company.

---

[3] Dr. Florian disputes that he approached Dr. Bergus.  Rather, he has testified that it was Dr. Bergus who first asked Dr. Florian about investments in Peru and inquired if "he could invest in that company."

Dr. Florian also told Dr. Bergus that the Company "ha[s] the exclusive government contracts in place to supply water and sewer services to one locale and [they] own the land on which the water treatment plant and sewer treatment plant would be developed."[4]  Dr. Bergus then decided to invest without any due diligence on his part because of his trust in Dr. Florian.

On September 24, 2012, Dr. Bergus received an email from Señor Baca (titled "Partnership Agreement and Private Investment Contract") attaching a signed contract in English for Dr. Bergus's investment of $125,000 in the Company in exchange for 2.5% of the Company's ownership interests ("September 2012 Contract").[5]  This email, according to Dr. Bergus, was the first

---

[4] The quoted language is from Dr. Bergus's Affidavit in support of his First Motion for Real Estate Attachment.
  At his deposition, Dr. Bergus also stated the following:
      Q How did Dr. Florian verbally offer you a contract?
      A Dr. Florian approached me and said that he has --
      him and his brother have a well project going on in
      Peru. All contracts and all land are owned. They need
      a little extra cash to get through some of the
      government bureaucracies and I'm going to get a
      substantial return of my money. Would I be interested
      in this investment? "I have checked this out. This is
      a very good investment. Everyone is on the level here.
      The government's on board here. It's a very stable
      investment. We can get a return on this very quickly."
      That's how it was offered to me.

[5] In the email, Señor Baca stated:
      Dear Dr. Bergus,
        We are pleased to adress [sic] and welcome you as a
      new partner of our company as we honored that you are
      part of it. I hope soon to have the pleasure of meeting
      you, hopefully you'll come to Peru, or when I travel to
      the U.S. I am forwarding the contract duly signed with

communication he ever had with Señor Baca.[6]  Dr. Bergus countersigned the contract and wired the funds to Señor Baca the next day.

The September 2012 Contract stated that the Company "has been developing for three years a comprehensive mega project of water and sewage in the city of Juliaca ... which to date is in its final stage" and "has acquired land of 100,000 square meters to develop the treatment plant for the water area and 60,000 square meters to implement the treatment plant for wastewater (sewage)."

According to Dr. Bergus, Dr. Florian failed to inform Dr. Bergus that, contrary to the contract language, the Company had in fact shelved the project in Juliaca by 2012.  Although the Company secured the concession, *i.e.*, the right to exploit the land, from the city of Juliaca in December 2010, Señor Baca

_____

all important specifications and information you need to know.
  My brother in law Gus has given us the best references and reliability of you.
Best regards,
Sincerely,
Jose Antonio Castro Baca
CEO Eps Eserapal Juliaca Sac

[6] According to Señor Baca, however, he had met Dr. Bergus in April 2012 before Dr. Bergus signed the September 2012 Contract when Señor Baca was in the United States for his mother's birthday.  It was during their in-person meetings in April 2012, Señor Baca and Dr. Florian contend, that Dr. Bergus offered to invest in the Company.  I address Dr. Florian and Señor Baca's April 2012 contentions *infra* Section II.B.1.b.

has testified that the project in Juliaca was delayed and the Company "had to go to a different district [in Caracoto] and start again" because the mayor in Juliaca asked for bribes "through 2011, and '12."[7]  Señor Baca also testified that he told both Dr. Bergus and Dr. Florian about the bribes and the subsequent development.

In addition, Dr. Bergus claims that the Company did not own any of the 160,000 square-meter land specified in the September 2012 Contract, and thus Dr. Florian made a misrepresentation when approaching Dr. Bergus.  Dr. Bergus produced eight negative certificates of real property issued by the Peruvian registry, which show no deeds of land ownership "registered or provisionally registered" in the name of the Company at any time from December 2010 to the 2018 dates of the eight certificates.[8]

---

[7] In particular, Señor Baca testified:
  A: Can I add some? The mayor asked for some money and we didn't
     give it to him and through 2011 and '12, '12, he tried to
     eliminate this and we did not want to enter discussion and
     problems with the mayor through 2012, 2012.
  Q: This development with the mayor requesting money that you
     did not pay, did you tell Dr. Bergus and Dr. Florian of
     this development?
  A: Of course. It was a shame.
  Q: Did it -- did the fact that the mayor was demanding money
     from the company, did it delay progress of the company?
  A: Totally. And we had to go to a different district and start
     again.
[8] Dr. Florian challenges the probative value of these certificates.  To prove land ownership, Dr. Florian produced a deed [Dkt. Nos. 83-4; 83-5] that shows the Company owned the land at issue as of April 9, 2015.  At the hearing regarding this summary judgment motion, Dr. Florian's counsel further

Señor Baca further admitted at the deposition that the Company did not own any land by September 2012.[9]  There appears no direct evidence, however, that Dr. Florian, as distinguished from Señor Baca, knew that the Company did not actually own the land as of April 2012.[10]  Dr. Florian instead averred that "it was [his]

---

suggested that land ownership in Peru may not be registered contemporaneously due to the country's unstable political circumstances.  Dr. Bergus's April 15, 2020 motion to strike [Dkt. No. 89] centers on Dr. Florian's second affidavit and affiliated exhibits [Dkt. No. 83] filed in support of his sur-reply [Dkt. No. 84] in opposition to Dr. Bergus's second motion for attachment [Dkt. No. 69].  Dr. Florian filed the 2015 deed along with his affidavit.  As I explained during the June 10, 2020 summary judgment hearing, Dr. Florian's knowledge as of 2015 is not material, nor is the more specific question of ownership of the property at that time.  It appears that nothing in Dr. Florian's affidavit contradicts his prior testimony; rather the affidavit is an effort to explain it further.  *See Patten* v. *Metro. Prop. & Cas. Ins. Co.*, __F. Supp. 3d__, 2022 WL 2118323, at *2 (D.N.H. June 13, 2022).  However, "to the extent that [Dr. Florian's] affidavit includes [] conclusory statements not based upon personal knowledge, those statements will be given no weight in [support of his] motion for summary judgment." *Reynolds* v. *Steward St. Elizabeth's Med. Ctr. of Bos., Inc.*, 364 F. Supp. 3d 37, 58 (D. Mass. 2019).  That said, I will deny Dr. Bergus's Motion to Strike.  [Dkt. No. 89] *See supra* note 1.

[9] Señor Baca testified in response to questions at his deposition:

  Q: So let's talk about land ownership. You testified earlier that as of September 24, 2012, the company did not, in fact, own 160,000 square meters of land, correct?

  A: Of course not.

At an earlier deposition, however, Señor Baca seemed to provide contradictory testimony that the Company owned some land in September 2012.

[10] Señor Baca admitted telling Dr. Bergus, presumably through Dr. Florian, that the Company was still "looking for land" as referenced in the September 2012 Contract.  But reading the record in the light most favorable to Dr. Bergus, any such conversation would have to have taken place after Dr. Bergus

knowledge that the Company owned the land" as referenced in the contract.

### 3.   Second Investment in May 2014

In early 2014, Dr. Florian told Dr. Bergus that the Company's project had expanded and now had contracts with two cities, both Juliaca and Caracoto.  He informed Dr. Bergus that Señor Baca was coming to the United States to seek an additional investment from Dr. Bergus.  In April 2014, Señor Baca, Dr. Bergus, and Dr. Florian had a meeting in Norwood, Massachusetts. At the meeting, Señor Baca asked Dr. Bergus to invest an additional $250,000.[11]

On May 7, 2014, Dr. Florian forwarded to Dr. Bergus an email from Señor Baca dated April 29, 2014 (purportedly to Dr. Bergus but with an incorrect address) offering an additional 5% interest in the Company for the $250,000.  Dr. Bergus replied to Dr. Florian "Thank you" and then informed Dr. Florian that he rejected the 5% offer and requested more.  Dr. Florian told Dr. Bergus that he would need to discuss this with Señor Baca.

---

signed the September 2012 Contract, because Dr. Bergus denies having communicated with Señor Baca directly prior to that date. [11] According to Señor Baca, it was Dr. Bergus who offered to invest another $350,000 during the April 2014 meeting after Señor Baca showed Dr. Bergus the resolution for the concession to develop the water project in Caracoto.  They then negotiated the terms for an additional investment of $250,000, in part, "face to face" and in part translated through Dr. Florian.

Over the next few days, Dr. Bergus and Dr. Florian discussed a new agreement that would replace the September 2012 investment contract.  Under the new agreement, Dr. Bergus would get a total of 9% interest in the Company in exchange for $375,000, of which $250,000 was to be his new investment.  On May 13, 2014, Dr. Florian forwarded to Dr. Bergus another email from Señor Baca (again to an incorrect address for Dr. Bergus) attaching a new investment contract dated May 12, 2014 ("May 2014 Contract").  Dr. Bergus countersigned the May 2014 Contract.  On May 20, 2014, Dr. Bergus wired $250,000 to Señor Baca.

The May 2014 Contract stated that "[the Company] has been developing for more than three years a comprehensive mega project of water and sewage in the cities of Juliaca and Caracoto ... which to date is in its final stage."  Further, the Company "has gained [an] Exploitation Concession Contract Water and Sewerage for Fifty years granted by the Provincial Council of San Roman-Juliaca ... [And a]s of today the [C]ompany has three pieces of land of: 100,000, 160,000 and 40,000 square meters to develop three Potable Water Treatment Plants ... [and] another piece of land of 60,000 square meters to implement the Wastewater Treatment Plant (sewage)."

According to Dr. Bergus, Dr. Florian again misrepresented the scope of the project and the land ownership when Dr. Bergus made this new investment in 2014.  As to the scope of the

project, Señor Baca testified that he told Dr. Bergus through Dr. Florian during the April 2014 meeting that the Company was pursuing the project solely in Caracoto by that time, and the Juliaca project was only possible if the Company could "get the Caracoto project going."[12]  Dr. Florian, however, testified that he told Dr. Bergus that the project had expanded to include both cities.[13]

---

[12] Señor Baca testified in response to questioning:

   Q: Is it your testimony, Senor Baca, that at this April 2014 meeting, you told Dr. Bergus in Spanish that the company was proceeding solely with the new Caracoto project?
   ...
   A: I --
   Q: Well, you spoke in Spanish.
   A: No, it must have been in English because he doesn't speak Spanish. So my brother-in-law must have told him that, because, yes, I spoke in Spanish.
   ...
   Q: Is it your testimony that at this April 2014 meeting, you told Dr. Bergus that the company was proceeding solely with the new Caracoto project?
   A: Of course, because we were ready to finish everything and to obtain everything. And I also told him that if we were going to be able to get the Caracoto project going, then we were going to also get the Juliaca project and then we were going to have more profit.

[13] Dr. Florian testified in response to questioning:

   Q: So is it your testimony, sir, that you told Boris that the project was changing from San Roman-Juliaca to just Caracoto?· Is that your testimony, sir?
   A: No, that's not.· I didn't tell, told, I said I have changed the name, the denomination of the company.· From Juliaca to Juliaca Caracoto.
   Q: You told Boris that the project had expanded --
   A: Yes.
   Q: -- correct?
   A: Yes.
   Q: It included both San Roman-Juliaca, correct?
   A: Yes.

As to the land ownership, the May 2014 Contract referenced three pieces of land[14] (two of them were mentioned in the September 2012 Contract) with a total of 360,000 square meters. The eight negative certificates Dr. Bergus obtained from the Peruvian registry, as noted above, show no deeds of land ownership registered under the Company at any time from 2010 to 2018. Señor Baca also concedes that as of May 2014, the Company did not own the 360,000 square meters of land as referenced in the contract.[15] According to Señor Baca, the Company had owned the land at one point but was forced to return it to the communities later in 2015 due to local strife with the

---

Q: And the City of Caracoto?
A: Yes.

[14] The May 2014 Contract refers to "three pieces of land: 100,000, 160,000 and 40,000 square meters" and "[a]nother piece of land of 60,000 square meters." [Dkt. No. 48-12] Señor Baca testified that the May 2014 Contract referred, in total, to three parcels of land, despite describing four separate pieces. [Dkt. No. 48-8, Baca Dep. Tr. at 16:8-17:5] The 2012 Contract notes two pieces of land, "100,000 square meters to develop the treatment plant for the water area and 60,000 square meters to implement the treatment plant for wastewater (sewage)." [Dkt. No. 48-25]

[15] Señor Baca testified:

Q: So as of May 2014, when Dr. Bergus signed the second investment contract, [the company] did not own three parcels of land totaling 360,000 square meters?
A: Yeah, false. I had a -- I had a pre-contract that was signed by the parts -- by the parties and that was signed before the deed was issued, and I can offer to present it here.

At an earlier deposition, however, Señor Baca seemed to provide contradictory testimony that the Company owned the land at issue in May 2014.

government.[16]  While Dr. Florian contends he believed at the time that the Company did own the land as referenced in the May 2014 Contract, Señor Baca's testimony appears to suggest that he attempted to convey the lack of ownership information to Dr. Bergus through Dr. Florian during their meetings in 2014.[17]

The parties dispute also whether Dr. Florian received a 6.5% stock kicker as a result of Dr. Bergus's second investment in 2014.  Public filings show that Dr. Florian owned 15% of the Company at its founding in 2010 and the percentage remained the same at least until the shareholder meeting on May 16, 2014, reflected in the Official Minutes.[18]  According to Dr. Bergus, in April and May 2014, Dr. Florian told Dr. Bergus that Dr. Florian

---

[16] Señor Baca contends that since the land dispute with the communities "was resolved by an extra judicial resolution," the information did not show up in the Peruvian official registry.

[17] For example, Señor Baca stated:

   Q: This is a meeting in April 2014 in Massachusetts, correct?
   A: I -- those -- that land was not mine, or it was not -- it didn't belong to the company either. I showed [Dr. Bergus] pictures of the land that we were trying to acquire and -- and I gave you the deeds of those. I gave them here. I submitted them here and then I also gave Boris copies of that.

Also, with reference to a meeting with Dr. Bergus, likely in April 2014, Señor Baca testified:

   Q: Explain to me the facts and circumstances that lead up to this next investment of $250,000.
   A: At 2014 when I -- I visit him and I show him that we have obtain the concession and I show him that we needed to make donations to the community and they would give us three pieces of land ...

[18] Dr. Bergus has also pointed out that Dr. Bergus's 2.5% interest from his first investment in 2012 was not reflected in the Official Minutes.

would get "something" if Dr. Bergus invested the additional $250,000.  On September 2, 2014, after Dr. Bergus made the second investment, Dr. Florian entered into the "Partnership and Private Investment Contract" with Señor Baca in Peru.  The contract "declares that 21.5% of the company's total share capital now belongs to [Dr. Florian]."

According to Dr. Florian, however, his increase of 6.5% happened in 2011, before any of Dr. Bergus's investments.  The increase in his interest was memorialized in the "Investment Recognition and Transfer Contract" dated March 10, 2011.  That contract indicated that Dr. Florian was granted the additional 6.5% interest in the Company because he previously invested $100,000 in a separate, unrelated, venture.

## B.   *Procedural History*

On February 20, 2018, Dr. Bergus filed a verified complaint[19] commencing this action against Dr. Florian.  On March 22, 2018, Dr. Florian filed his answer and counterclaimed against Dr. Bergus for abuse of process.  After I denied Dr. Bergus's motion to dismiss Dr. Florian's counterclaim, the

---

[19] A verified complaint may be "treated as the functional equivalent of an affidavit." *Sheinkopf* v. *Stone*, 927 F.2d 1259, 1262 (1st Cir. 1991).  Accordingly, I have considered it as providing evidence of record in connection with the summary judgment record.

parties undertook discovery.  Thereafter, Dr. Florian filed the instant motion for summary judgment.[20]

## II. ANALYSIS

### A.  *Standard of Review*

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "A dispute is 'genuine' if 'a reasonable jury could resolve the point in favor of the nonmoving party.'"  *Staples* v. *Gerry*, 923 F.3d 7,12-13 (1st Cir. 2019) (quoting *Meuser* v. *Fed. Express Corp.*, 564 F.3d 507, 515 (1st Cir. 2009)).  "A fact is material only if it possess[es] the capacity to sway the outcome of the litigation under the applicable law."  *Vineberg* v. *Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008) (internal quotation and citation omitted).

Assessing the merits of a motion for summary judgment, I "resolve all conflicts and draw all reasonable inferences in the

---

[20] On January 16, 2020, Dr. Bergus filed a second motion for writ of attachment [Dkt. No. 69], which I had taken under advisement pending the disposition of this summary judgment motion.  I had referred Dr. Bergus's first attachment motion to Magistrate Judge Jennifer C. Boal, who issued a Report and Recommendation on November 21, 2019, recommending denial of that motion for writ of attachment.  The Report and Recommendation became moot after I granted Dr. Bergus's withdrawal of his first attachment motion.  At a scheduling hearing on October 12, 2022, the parties reported that the second motion for a writ of attachment was rendered moot by a sale of the subject property immediately after the June 10, 2020 summary judgment hearing in this case.

nonmovant's favor." *Id.* Nevertheless, the nonmovant must do more than "rest upon conclusory allegations, improbable inferences, and unsupported speculation" and provide "submissions of evidentiary quality" to meet the burden. *Id.* (internal quotations and citations omitted).

## B. *Massachusetts Uniform Securities Act*

Dr. Bergus claims that Dr. Florian is liable to him under the Massachusetts Uniform Securities Act, specifically MASS. GEN. LAWS ch. 110A, § 410(a)(2),[21] because Dr. Florian solicited Dr. Bergus to make the two investments, separately in 2012 and in 2014, by misrepresentation.

Under § 410(a)(2), a plaintiff must establish: "(1) the defendant offer[ed] or [sold] a security; (2) in Massachusetts; (3) by making any untrue statement of a material fact or by omitting to state a material fact; (4) the plaintiff did not know of the untruth or omission; and (5) the defendant knew, or in the exercise of reasonable care [would] have known, of the untruth or omission." *Marram* v. *Kobrick Offshore Fund, Ltd.*,

---

[21] In his Complaint, Dr. Bergus appears also to allege violations of GEN. LAWS ch. 110A, § 410(a)(1), relating to registration requirements, and of § 410(b), relating to secondary liability, but he does not address any of those theories in his memoranda opposing summary judgment. Consequently, I do not address those theories in connection with the motion now before me. *Baltodano* v. *Merck, Sharp & Dohme (I.A.) Corp.*, 637 F.3d 38, 43–44 (1st Cir. 2011) (Thompson, J.) (explaining that a court may only address summary judgment sua sponte in limited situations).

809 N.E.2d 1017, 1026 (Mass. 2004) (internal quotations and footnote omitted) (quoting MASS. GEN. LAWS ch. 110A, § 410(a)(2)); *Tutor Perini Corp.* v. *Banc of America Secs. LLC*, 842 F.3d 71, 85 (1st Cir. 2016).  In interpreting § 410(a)(2), the Supreme Judicial Court of Massachusetts has directed the courts to "look to Federal decisions under § 12(2) [of the Securities Act of 1933]" for guidance.[22]  *Marram*, 809 N.E.2d at 1025; *see also Adams* v. *Hyannis Harborview, Inc.*, 838 F. Supp. 676, 684 n.9 (D. Mass. 1993) (noting that the Massachusetts securities laws "are substantially similar to the federal securities laws and therefore decisions construing the federal statutory language are applicable to the state statute as well"), *aff'd sub nom. Adams* v. *Zimmerman*, 73 F.3d 1164 (1st Cir. 1996).

## 1.   Whether Dr. Florian Was a "Seller"

Dr. Florian contends, as his flagship argument, that the undisputed evidence shows as a matter of law that he was not a statutory "seller" who offered or sold a security to Dr. Bergus.

---

[22] Section 12(2)of the Securities Act "provides that any person who 'offers or sells' a security by means of a prospectus or oral communication containing a materially false statement or that 'omits to state a material fact necessary to make the statements, in the light of the circumstances under which they were made, not misleading,' shall be liable to any 'person purchasing such security from him.'"  *Shaw* v. *Digit. Equip. Corp.*, 82 F.3d 1194, 1201 (1st Cir. 1996) (quoting 15 U.S.C. § 77*l*(2)), *superseded by statute on other grounds*, 15 U.S.C. § 78u-4(b)(1, 2).

§ 410(a)(2).  I cannot agree.  In my review of the record, there are genuine issues of material fact as to Dr. Florian's "seller" status.

        *a.   Legal Standard for "Seller" Status*

A defendant has offered or sold a security within the meaning of § 410(a)(2) if he (1) "successfully solicits the purchase" and (2) is "motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  *Hays* v. *Ellrich*, 31 N.E.3d 1064, 1071 (Mass. 2015)(citation omitted).  So defined, the term "seller" encompasses more than the individual who actually transfers title in a transaction.  *Adams*, 838 F. Supp. at 686.  Brokers, agents, and other "persons commonly thought of as those from whom the buyer 'purchased' are sellers under the securities laws."  *Id.; see Mass. Mut. Life Ins. Co.* v. *Residential Funding Co., LLC,* 843 F. Supp. 2d 191, 205 (D. Mass. 2012) (citing *Pinter* v. *Dahl*, 486 U.S. 622, 646-47 (1988)).  "The relevant inquiry for seller liability is the defendant's relationship with the plaintiff-purchaser, not the defendant's degree of involvement in the securities transaction and its surrounding circumstances."  *Mass. Mut. Life Ins. Co.*, 843 F. Supp. 2d at 206 (internal quotation and citation omitted).

To establish that a defendant successfully solicited a purchase, a plaintiff must do more than allege a defendant's

collateral involvement in the transaction.   "[A] defendant must be directly involved in the actual solicitation of a securities purchase. . . ."  *Shaw* v. *Digit. Equip. Corp.*, 82 F.3d 1194, 1215 (1st Cir. 1996) (discussing § 12 of the Securities Act of 1933), *superseded by statute on other grounds*, 15 U.S.C. § 78u-4(b)(1, 2).  Proof that "the defendant *caused* a plaintiff's purchase of a security is not enough."  *Id.* (citing *Pinter*, 486 U.S. at 651) (emphasis in original).  Neither does a defendant's "'remote' involvement in a sales transaction or his mere 'participat[ion] in soliciting the purchase'" satisfy the solicitation element.  *Id.*  The requirement of actual solicitation shields "participants[] collateral to the offer or sale" from liability, including "securities professionals, such as accountants and lawyers."  *Pinter*, 486 U.S. at 650-51.

In addition to the solicitation element, a "seller" must be "motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  *Hays*, 31 N.E.3d at 1071 (internal quotation and citation omitted). "Typically, a person who solicits the purchase will have sought or received a personal financial benefit from the sale, such as where he anticipates a share of the profits, or receives a brokerage commission."  *Pinter*, 486 U.S. at 654-55 (internal citation and quotations omitted).  Massachusetts follows those courts that "have taken a more expansive view of financial gain

that includes increased compensation tied to share price[s] or company performance" bolstered by new investments. *Hays*, 31 N.E.3d at 1072 (quoting *In re OSG Secs. Litig.*, 971 F. Supp. 2d 387, 404, n.119 (S.D.N.Y. 2013)).

> b.   *Dr. Florian's Role in the September 2012 Investment*

With respect to Dr. Bergus's first investment in 2012, I find that there are genuine issues of material fact as to whether Dr. Florian was a "seller."

First, there is evidence from which a reasonable jury could conclude that Dr. Florian solicited the investment.  According to Dr. Bergus, he never had any communication with Señor Baca until he received Señor Baca's email attaching the September 2012 Contract.[23]  Dr. Florian disputes Dr. Bergus's version of events.  He contends that Dr. Bergus met Señor Baca in April 2012.  In this connection, Dr. Florian submits [Dkt. Nos. 97-1; 97-2] immigration documents he asserts demonstrate that Señor Baca traveled to the United States at that time.  [June 10, 2020 Hr'g Tr. at 3:19-4:21]  I have reviewed Dr. Florian's

---

[23] The language of the email would appear to suggest that Señor Baca had not yet met Dr. Bergus and the investment was only possible because of Dr. Florian:
> "I hope soon to have the pleasure of meeting you, hopefully you'll come to Peru, or when i travel to the U.S.
> ...
> My brother in law Gus has given us the best references and reliability of you."

submissions, and it appears that the parties in their respective arguments have overlooked an April 19, 2012 U.S. entry stamp on Señor Baca's Peruvian passport[24]. *See* Dkt. No. 97-1 at 14.  Dr. Florian's additional submission, which shows Señor Baca's travel history between Peru and the United States from April 19 to April 27, 2012, corroborates the entry stamp.  [Dkt. No. 97-2 at 1]  Accordingly, there is evidence that Señor Baca was in the United States during the relevant time period.

His presence in the United States, however, does not resolve whether Señor Baca — but not Dr. Florian — solicited Dr. Bergus's initial investment.  The documents do not show the purpose of Señor Baca's travel to the United States.  In fact, the record supports an alternative reason for Señor Baca's travel — his mother's birthday.  [Dkt. No. 48-16, Baca Dep. Tr. at 92:15-21]  Dr. Florian provides no other documentation that would allow me to resolve this highly contested issue, and a trial, not a motion for summary judgment, is the appropriate vehicle for "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

---

[24] I note in this connection, the "B1/B2" stamp layered on top of the U.S. entry stamp.  This "B1/B2" stamp appears to refer to the type of Visa that an individual is using to enter the United States.  I take judicial notice that B2 refers to tourism.  *See* FED. R. EVID. 201(b)(2).  Thus the "B1/B2" stamp can be read to refer to the expiration of the B2 visa, which is apparently 6 months after entry.

facts." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

By "scrutinizing the entire record in the light most flattering to [Dr. Bergus] and indulging all reasonable inferences in [his] favor," *Maldonado-Denis* v. *Castillo-Rodriguez*, 23 F.3d 576, 581 (1st Cir. 1994), a factfinder could determine it was Dr. Florian who first approached Dr. Bergus in April 2012 about the Company and invited Dr. Bergus to invest. Dr. Florian described the Company as a "great investment opportunity" and told Dr. Bergus that the Company had exclusive government contracts and owned the land to develop the water project.  These facts, if proven, would establish that Dr. Florian alone had a close "relationship with the plaintiff-purchaser" before Dr. Bergus signed the contract.  *See Pinter*, 486 U.S. at 651.  Dr. Florian's words and interaction with Dr. Bergus can reasonably be viewed as recommending and promoting the investment opportunity, demonstrating Dr. Florian's direct and active role in the solicitation.  *See Meadows* v. *S.E.C.*, 119 F.3d 1219, 1225 (5th Cir. 1997) (finding defendant solicited investors when "the record demonstrates [defendant] recommended the Companies to investors" by characterizing the investment as a good deal in various ways).

Although there is no evidence that Dr. Florian had a role in drafting the September 2012 Contract and the evidence

strongly suggests that he did not sign it, Massachusetts securities law covers not only direct transferrers of interest, but also those who "successfully solicit[ed] the purchase." *Hays*, 31 N.E.3d at 1071 (citation omitted).  Although Dr. Florian denied approaching Dr. Bergus in the first place and Señor Baca insisted that any solicitation took place when he met Dr. Bergus in person, their testimony underscores that a genuine dispute exists with Dr. Bergus over material facts.

Second, there is evidence that supports the contention that Dr. Florian was motivated at least in part by his financial interests.  It is undisputed that Dr. Florian was a shareholder of the Company in April 2012, and remained one.  Additional capital infused into the Company was reasonably expected to improve its performance.  And because Massachusetts courts have tied personal financial gains with the company's general performance, Dr. Florian, by virtue of being a shareholder, can be viewed as motivated by an expected enhanced return from the infused capital.  *See Hays*, 31 N.E.3d at 1072 (defendant motivated by personal financial gains when investment increased the company's net asset value, which increased his investor advisory fees.); *see also Meadows*, 119 F.3d at 1226 (finding that defendant, as an indirect shareholder of the companies, "stood to benefit personally from the additional investments he solicited"); *cf. In re OSG Secs. Litig.*, 971 F. Supp. 2d at 404

(holding that an issuer's officers and directors were motivated in part by their financial interests "by virtue of their continued positions and salaries" where the at-issue company's survival was "at stake").

Dr. Florian contends that Dr. Bergus has presented no evidence showing the actual change in value for Dr. Florian's ownership as a result of Dr. Bergus's investment.  But that is not a requirement to qualify as "seller" under the Massachusetts securities law; solicitors need only "anticipate[] a share of the profits" from the investment regardless of whether the profits actually materialize.  *Pinter*, 486 U.S. at 654–55 (internal quotation omitted).  A seller, to be motivated by those potential gains, also need only expect improved company performance that could be linked to personal gains.  *See Hays*, 31 N.E.3d at 1072 (even though the fund for which an advisor solicited investment became insolvent, the Supreme Judicial Court held the advisor to be a "seller" because he expected a "potential for a long-term increase" in his fees if the fund performed well).  Here, Dr. Bergus does not need to prove that the Company's performance actually improved with the capital infusion, so long as it was expected.

Genuine issues of material fact therefore exist as to whether Dr. Florian solicited Dr. Bergus to invest in 2012 and was motivated in part to serve his own financial interests.

24

        *c.   Dr. Florian's Role in the May 2014 Investment*

Because Dr. Florian remained a shareholder of the Company in 2014 when Dr. Bergus made his second investment, the same analysis regarding Dr. Florian's financial interests in connection with the 2012 transaction also applies to the 2014 transaction.[25]  The only remaining question regarding Dr. Florian's "seller" status is whether Dr. Florian solicited Dr. Bergus's 2014 investment.

Dr. Florian maintains that he was merely a translator throughout the process.  But the record contains sufficient evidence from which a factfinder could infer that Dr. Florian acted as more than a conduit for communication.

Before Señor Baca's meeting with Dr. Bergus in April 2014, Dr. Florian updated Dr. Bergus regarding the Company's progress and, according to Dr. Bergus, brought up the opportunity for additional investment.  Notably, Dr. Florian told Dr. Bergus that the Company's project had expanded to include both Juliaca and Caracoto.  And after the meeting with Señor Baca, Dr. Bergus communicated solely with Dr. Florian to negotiate key terms of the new agreement, in particular the percentage of ownership Dr.

---

[25] Additionally, the parties dispute whether Dr. Florian received a 6.5% stock kicker as a result of Dr. Bergus's 2014 investment. This presents additional material facts in dispute that, read in the record in the light most favorable to Dr. Bergus, could demonstrate Dr. Florian's additional financial motivation in soliciting the investment.

Bergus was to receive.  This form of direct interaction between Dr. Florian and Dr. Bergus without Señor Baca's involvement rebuts the contention that Dr. Florian was merely a translator.

There is, moreover, inconsistency between testimony by Dr. Florian and that by Señor Baca regarding what was translated during the April 2014 meeting.  For instance, Señor Baca averred he told Dr. Bergus, through Dr. Florian presumably, during the meeting that the Company had abandoned the project in Juliaca rather than pursuing both cities.  Señor Baca also suggested he attempted to inform Dr. Bergus that the Company did not own the land.  The evidence of record supports a finding that Dr. Florian failed to convey that information to Dr. Bergus.  This further casts doubt on Dr. Florian's role as a pure translator; rather, it suggests he was independently refining the information to be conveyed to Dr. Bergus.

To be sure, the undisputed record shows that Señor Baca was the primary person who solicited Dr. Bergus's additional investment during their meeting in April 2014.  Señor Baca was apparently also the final decision-maker regarding the sale. Dr. Bergus recognized, for example, that Dr. Florian would need to "discuss [Dr. Bergus's] rejection [of the offer] with [Dr. Florian's] brother in law."  But there can be more than one "seller" working to solicit a securities purchase.  Unlike in *Capital Ventures International* v. *J.P. Morgan Mortgage*

26

*Acquisition Corp.*, No. 12-cv-10085-RWZ, 2013 WL 535320, at *7 (D. Mass. Feb. 13, 2013), where the plaintiff alleged only a "conclusory allegation" that defendants "worked collectively" to market and sell the securities, Dr. Bergus here has raised specific, albeit disputed, evidence sufficient to survive a motion for summary judgment.  Dr. Florian updated Dr. Bergus regarding the Company's progress, negotiated contract terms with him, and restated information conveyed at the meeting.  This record evidence demonstrates not simply "involvement in preparation ... [or] participation in activities relating to the sale of securities," *Shaw*, 82 F.3d at 1216 (internal quotation omitted); it demonstrates direct involvement in the "actual solicitation," *id.* at 1215.

I thus find genuine issues of material fact as to whether Dr. Florian was a statutory "seller" with respect to both of Dr. Bergus's investments.

### 2.   Whether Dr. Florian Made Misrepresentations

To prevail on his Massachusetts securities law claim, Dr. Bergus must establish not only that Dr. Florian was a "seller," but also that Dr. Florian made some "'untrue statement of a material fact,' or [] omit[ed] to state a material fact." *Marram*, 809 N.E.2d at 1026 (quoting Mass. Gen. Laws ch. 110A, § 410(a)(2)).  That showing is required before the burden can be shifted to Dr. Florian to prove his lack of knowledge of the

untruth or omission.[26] *Id.; see Amorim Holding Financeria,*

*S.G.P.S., S.A.* v. *C.P. Baker & Co., Ltd.,* 53 F. Supp. 3d 279,

296 (D. Mass. 2014) (describing the "burden-shifting mechanism"

under Mass. Gen. Laws ch. 110A, § 410(a)(2))).

For both transactions, Dr. Bergus focuses on two purported
misrepresentations in opposing the summary judgment: (1) that
Dr. Florian omitted the material fact that the Company had
shelved its project in Juliaca by 2012 due to bribery; and (2)
that Dr. Florian made untrue statements of material fact
representing the Company owned the land referenced in both
contracts.

There is clear dispute in the record as to whether
Dr. Florian omitted material information about the scope of the
project in both 2012 and 2014, and as to whether the Company
actually owned the land at issue.  Further, neither party seems
to argue that these facts are immaterial.  I determine as a
matter of law that viewed from the perspective of the
"reasonable investor," the disclosure of project location and
land ownership would "significantly alter[] the total mix of
information available" about a company that develops a water

---

[26] There is no meaningful dispute in this case as to the other
prongs under Mass. Gen. Laws ch. 110A, § 410(a)(2), namely that the
sales of securities occurred in Massachusetts and Dr. Bergus was
not otherwise aware of the untruth or omission.

project beneath the ground.  *Marram*, 809 N.E.2d at 1030

(internal quotation omitted).

As the Supreme Judicial Court in *Marram* recognized, the

Massachusetts securities law "provides strong protections" to

the purchaser by "hold[ing] the seller to the heavy burden of

proof 'that he did not know, and in the exercise of reasonable

care could not have known, of the untruth or omission.'" 809

N.E.2d at 1026 (quoting MASS. GEN. LAWS ch. 110A, § 410(a)(2))

(citing J.C. LONG, BLUE SKY LAW, § 9:23 at 9-35 (2003) (defendant

sellers are held to an "inverse negligence standard" that is "a

very difficult defense to sustain")).

Dr. Florian fails to meet this heavy burden with respect to

the question in dispute.  As noted above,[27]  Señor Baca testified

that during the April 2014 meeting, he conveyed the information

about both the location change and non-possession of the land to

Dr. Bergus through Dr. Florian's translation.  This, if proven,

would establish Dr. Florian's knowledge at the time of

solicitation.

Similar attempts to disclose via translation were made by

Señor Baca in 2012,[28] although the precise timing of that

conversation is unclear from Señor Baca's testimony.  Such a

conversation may have happened after Dr. Florian's solicitation

---

[27] *Supra* footnotes 12 & 17.
[28] *Supra* footnotes 7 & 10.

in April 2012, given that Dr. Bergus denied ever communicating
with Señor Baca prior to signing the September 2012 Contract.
But even if nothing in the record suggests Dr. Florian's actual
knowledge as of April 2012, he has not presented undisputed
evidence that, with the exercise of reasonable care, he could
not have known the information.  Some evidence cuts directly
against Dr. Florian.  For example, Dr. Florian travels to Peru
regularly, has political connections there, and maintains a
close relationship with Señor Baca.  Dr. Florian was also a
shareholder in the Company.  In any event, because the
"reasonable care" defense "necessitates an extremely fact-
intensive inquiry ... courts addressing the issue in the
analogous federal securities law context repeatedly state that
[such a] defense generally cannot be resolved on a motion for
summary judgment." *Mass. Mut. Life Ins. Co.* v. *DB Structured
Prods.*, 110 F. Supp. 3d 288, 297 (D. Mass. 2015) (citation and
footnote omitted).

In sum, with respect to both of Dr. Bergus's investments, I
conclude that a factfinder could reasonably find that Dr.
Florian was a "seller" who misrepresented or omitted material
facts.  Consequently, I will deny Dr. Florian's motion for
summary judgment as to the Massachusetts securities law claim.

*C.   Breach of Fiduciary Duty*

To prevail on the breach of fiduciary duty claim under Massachusetts law[29], "a plaintiff must show (1) the existence of a duty of a fiduciary nature, based upon the relationship of the parties, (2) breach of that duty, and (3) a causal relationship between that breach and some resulting harm to the plaintiff." *Amorim Holding Financeria, S.G.P.S., S.A.*, 53 F. Supp. 3d at 295

---

[29] Recently, in *Robinhood Financial, LLC* v. *Galvin*, No. 2184CV00884, 2022 WL 1720131, at *1 (Mass. Super. Ct. Mar. 30, 2022) (Ricciuti, J.), a judge of the Massachusetts Superior Court addressed a fiduciary duty allegation "grounded upon a regulation adopted by the Secretary [of State of the Commonwealth]," 950 MASS. CODE. REGS. § 12.207(1)(a) ("the Fiduciary Duty Rule"). The regulation, for enforcement actions under MASS. GEN. LAWS ch. 110A, § 204(a)(2)(G), makes it an "unethical or dishonest conduct or practice" for broker-dealers to "fail [] to act in accordance with a fiduciary duty to a customer." *Id.* (quoting 950 MASS. CODE. REGS. § 12.207(1)(a)). Robinhood Financial, LLC challenged the rule, arguing, *inter alia*, that it was invalid and "unlawfully overr[ode] Massachusetts common law." *Id.* Judge Ricciuti agreed. *Id.* at *2. He explained that the regulation would make "broker-dealers who are not subject to fiduciary obligations under *Patsos* [v. *First Albany Corp.*, 741 N.E.2d 841, 849-52 (Mass. 2001)] . . . subject to [ ] the [regulatory] Fiduciary Duty Rule." *Id.* at *11. Accordingly, Judge Ricciuti held the rule invalid, noting there was nothing "suggest[ing] that the Legislature intended to give the Secretary authority to override existing Supreme Judicial Court Precedent or. . .re-define familiar securities concepts through rulemaking." *Id.* at *15. The Secretary has appealed the Superior Court's judgment. *See* Def.'s Notice of Appeal, *Robinhood Financial, LLC* v. *Galvin*, No. 2184C0084, ECF No. 49 (September 8, 2022). Of course, this developing issue under Massachusetts fiduciary duty law is not directly on point here because this is not an enforcement action. [Dkt. No. 1 at ¶¶ 89-94] Nevertheless, *Robinhood Financial, LLC* illustrates the ongoing demands of adjusting common law fiduciary duty doctrine to an increasingly statutory-based regime for regulatory fiduciaries.

(citation omitted).  Dr. Bergus alleges a type of fiduciary relationship that can be said to be analogous to one between a stockbroker and a customer.[30]  The record, however, fails to support such a fiduciary relationship between Dr. Florian and Dr. Bergus.

Massachusetts law recognizes that "[a]ssigning general fiduciary duties only to those stockbrokers who have the ability to, and in fact do, make most if not all of the investment decisions for their customers properly provides appropriate protection only for those customers who are particularly vulnerable to a broker's wrongful activities."  *Patsos* v. *First Albany Corp.*, 741 N.E.2d 841, 851 (Mass. 2001).  Courts have found that no fiduciary relationship exists "[w]here the account is 'non-discretionary,' meaning that the customer makes the

---

[30] To the extent that Dr. Bergus asserts any fiduciary relationship arising from Dr. Florian's status as a co-shareholder with Dr. Bergus, that claim would presumably be governed by the law of Peru, where the Company is incorporated. *See Mariasch* v. *Gillette Co.*, 521 F.3d 68, 71-72 (1st Cir. 2008) ("Massachusetts applies the internal affairs doctrine, which recognizes that only one State should have the authority to regulate a corporation's internal affairs - matters peculiar to the relationships among . . . shareholders . . . .  The state with authority over a corporation's internal affairs is the state of incorporation.") (quotation and citation omitted).  Dr. Bergus, however, does not allege violation of Peruvian law here; rather, the briefing has been under Massachusetts fiduciary law and Dr. Bergus has framed his allegations within the context of a "personal" and "investment relationship[]."  [Compl. at ¶¶ 89-94, Dkt. No. 1]  These allegations do not raise internal affairs doctrine concerns.

investment decisions and the stockbroker merely receives and executes a customer's orders."  *Id.* at 849.

Dr. Bergus's two investments were entirely non-discretionary.  To the extent that Dr. Florian served in a capacity analogous to a broker, he did not make any investment decisions for Dr. Bergus.  Dr. Bergus's testimony that he put trust in Dr. Florian in making his investment decision does not alter the analysis.  "[A] business relationship between a broker and customer does not become a general fiduciary relationship merely because an uninformed customer reposes trust in a broker who is aware of the customer's lack of sophistication."  *Id.* at 851.

The record reveals no fiduciary relationship between Dr. Bergus and Dr. Florian.  Consequently, I will grant Dr. Florian's motion for summary judgment as to the breach of fiduciary duty claim.

### III. CONCLUSION

For the reasons explained above, I DENY Dr. Bergus's motion respectively to strike [Dkt. No. 89] and [see Dkt. Nos. 97 and 99] opposition to Dr. Florian's effort to supplement the summary judgment record, and having done so, DENY in part (as to the Massachusetts securities law claim) Dr. Florian's motion [Dkt. No. 46] for summary judgment and GRANT it in part (as to the

breach of fiduciary duty claim).  Further, I DENY Dr. Bergus's

second motion for attachment [Dkt. No. 69] as moot.




                         */s/ Douglas P. Woodlock*
                         DOUGLAS P. WOODLOCK
                         UNITED STATES DISTRICT JUDGE